Opinion for the court filed by Circuit Judge PROST.
Dissenting opinion filed by Circuit Judge REYNA.
PROST, Circuit Judge.
Nova Chemicals Corporation (“Nova”) appeals from the district court’s denial of its motion for judgment as a matter of law. Nova argues that the district court should have, in the first place, found that the Dow Chemical Company (“Dow”) lacked standing to bring this suit. Nova also argues that the district court should have set aside a jury verdict of infringement in Dow’s favor and instead found that the patents asserted by Dow are invalid for indefiniteness and lack of an adequate written description and are not infringed. Because we see no error in the district court’s standing and invalidity analyses, and because substantial evidence supports the jury’s infringement finding, we affirm.
Background
Dow brought this suit to enforce U.S. Patent No. 5,847,053 (“'053 patent”) and U.S. Patent No. 6,111,023 (“'023 patent”) (collectively, “the patents in suit”). The patents in suit claim a new kind of plastic that is stronger than conventional plastics, which allows, for example, using thinner films (less plastic) for the same purpose. Dow markets its invention as ELITE. Nova’s competing product is named SURPASS. Dow claimed in the district court that SURPASS infringes the patents in suit. Nova put on a three-part defense. First, it argued that Dow lacked standing to enforce the patents in suit. Second, it argued that the patents in suit were invalid for indefiniteness and lack of an adequate written description.[1] Third, it ar *912 gued that SURPASS did not infringe the patents in suit.
Nova did not prevail on any of its arguments in the district court. The district court held a bench trial to resolve the standing issue and found that Dow had standing to enforce the patents in suit. Dow Chem. Co. v. Nova Chems. Corp., 726 F.Supp.2d 459, 463-64 (D.Del.2010). With respect to Nova’s indefiniteness argument, the district court found that the patents were not indefinite as a matter of law and construed the claims. The district court nonetheless allowed the jury to consider whether the patents were invalid for indefiniteness and lack of an adequate written description. The infringement issue was also submitted to the jury. In the end, the jury found the patents in suit valid and infringed and awarded approximately $61.7 million in damages to Dow for lost profits and reasonable royalties. The district court subsequently denied Nova’s renewed motion for judgment as a matter of law and entered judgment in line with the jury’s verdict. This appeal ensued. We have jurisdiction under 28 U.S.C. § 1295(a)(1).
Analysis
Nova makes three main arguments on appeal. First, it argues that Dow lacks standing to enforce the patents in suit. Second, it argues that the patents in suit are invalid for indefiniteness and lack of an adequate written description. Third, it argues that the jury’s verdict of infringement is not supported by substantial evidence. We address each argument in turn below.
A. Standing
The standing issue concerns the ownership of the patents in suit. There is no dispute that Dow is indeed the original assignee of the patents in suit and record title holder at the U.S. Patent and Trademark Office (“PTO”). Therefore Dow is the presumed owner of the patents in suit. See SiRF Tech., Inc. v. Int’l Trade Comm’n, 601 F.3d 1319, 1327-28 (Fed.Cir.2010) (“The recording of an assignment with the PTO is not a determination as to the validity of the assignment. However, we think that it creates a presumption of validity as to the assignment and places the burden to rebut such a showing on one challenging the assignment.” (citation omitted)). Effective on January 1, 2002, however, Dow and its holding company, Dow Global Technologies, Inc. (“DGTI”) entered into a “Contribution Agreement” (or “the agreement”) according to which a large share of Dow’s intellectual property rights was transferred to DGTI. Apparently, the Contribution Agreement was intended to generate certain tax benefits for Dow. Nova argues that the patents in suit were among the intellectual property rights that were transferred to DGTI under the Contribution Agreement. As a result, according to Nova, Dow does not have standing to enforce the patents in suit. Cf. Arachnid, Inc. v. Merit Indus., Inc., 939 F.2d 1574, 1579 (Fed.Cir.1991). Dow disagrees, arguing that it held on to the patents in suit so that it could enforce them in a suit such as this.
After holding a bench trial, the district court determined that the patents in suit were never transferred to DGTI. In particular, the court found that the Contribution Agreement was unambiguous in that it incorporated a document — entitled Schedule A — that contained a list of all the patents that were transferred to DGTI. The court heard and credited testimony from a Dow employee who was in charge of preparing and maintaining Schedule A, and she corroborated Dow’s assertion that the patents in suit never appeared in Schedule A. Based on these findings, the court found that Dow had met its burden *913 of establishing the ownership of the patents in suit. And, because the court found that the clear terms of the agreement controlled, it declined to evaluate the extrinsic evidence that Nova suggested defeated Dow’s standing. The court accordingly denied Nova’s request to dismiss the suit for lack of standing. For the reasons set forth below, we agree with the district court’s determinations.
Our standing analysis presents an issue of contract interpretation: whether Dow transferred the patents in suit to DGTI under the Contribution Agreement. Two sections of the Contribution Agreement (sections 2.01 and 1.07) are particularly important to our analysis. Section 2.01 of the agreement states,
2.01 Transfer of Patent Rights and Technology. Effective on the Transfer date, [Dow] hereby conveys, transfers, assigns and delivers to DGTI, and DGTI hereby accepts from [Dow] as an additional contribution to DGTI’s capital, all of [Dow’s] right and title to and interest in the Patent Rights, Technology and Work Processes, which rights are owned or controlled by [Dow] on the Transfer Date or thereafter.
J.A. 5041-42. This section essentially provides that Dow transferred its “Patent Rights” to DGTI. We must therefore determine whether the patents in suit fit within the scope of “Patent Rights.” That brings us to section 1.07, which defines “Patent Rights” in just two sentences:
1.07 “Patent Rights” means any and all patents and applications for patents of any kind, filed with and/or granted by a governmental body of the United States or any other country ... which are owned solely or controlled by [Dow] on the Transfer Date or thereafter, that [Dow] is able to assign to DGTI without the consent of or accounting to a Third Patty or Affiliated Company, without diminishing the royalties paid or payable by or otherwise materially affecting the obligations of such Third Party or Affiliated Company with respect to such Patent Rights, and without resulting in a loss of rights. The parties shall provide a schedule of Patent Rights as Schedule A to this Agreement, within ninety (90) days of the Effective Date, and shall provide subsequent supplements thereto from time to time during the Term.
J.A. 5040.
We begin our analysis of the scope of Patent Rights by noting that the first sentence in section 1.07 is not particularly helpful in determining whether the patents in suit were transferred to DGTI. That sentence describes that Patent Rights excludes those patents that cannot be transferred “without resulting in a loss of rights.”[2] This sentence cannot be interpreted literally because hardly anything can be transferred “without resulting in [some] loss of rights.” Nova and Dow thus each offer their own theory of what this “loss of rights” exception entails. Nova suggests that “loss of rights” only refers to loss of standing in any litigation that was pending when the agreement took effect. According to Nova, therefore, the exception was meant to ensure that any patents that were then involved in litigation remained with Dow. And because the patents in suit were not involved in litiga *914 tion when the agreement took effect, Nova argues, they were necessarily transferred to DGTI. Dow counters that the “loss of rights” exception was meant not only to protect its standing in then-pending litigation, but also to preserve its ability to recoup lost profits for those patents that would be asserted in future litigation (such as the patents in suit). Neither one of these theories is anchored in the text of the Contribution Agreement.
We are not at liberty, however, to detach our interpretive analysis from the four-corners of the contract at the mere suggestion that one phrase in the contract, viewed in isolation, is not readily amenable to literal interpretation. Rather, we “must give effect to all terms of the instrument, must read the instrument as a whole, and, if possible, reconcile all the provisions of the instrument.” Elliott Assocs. v. Avatex Corp., 715 A.2d 843, 854 (Del.1998); see generally, 11 Williston on Contracts § 32:5 (4th ed.2010). As we explain below, to the extent that the phrase “loss of rights” may require interpretation, it does not give us license to open the door to extrinsic evidence (and Dow’s and Nova’s subjective understanding of the term, for that matter) because the rest of section 2.01 and the agreement as a whole reveal that the patents in suit are not within the scope of Patent Rights.
Unlike the first sentence, the second sentence of section 1.07 makes it abundantly clear that Dow and DGTI intended Schedule A to include a list of all of the transferred patents (among other things).[3] In line with our obligation to resolve ambiguities in favor of a harmonious interpretation, we must hold that whatever the term “loss of rights” implies, it cannot serve to wipe out the clear reference to Schedule A. Moreover, “[sjpecific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.” DCV Holdings, Inc. v. ConAgra, Inc., 889 A.2d 954, 961 (Del.2005). Here, the “loss of rights” phrase is part of a broad exclusionary definition; whereas the reference to Schedule A is inclusionary and, indeed, quite specific. That gives us yet another reason to believe that the specific reference to Schedule A manifests the objective intent of the parties to the agreement and is thus controlling here. As we see it, well-established principles of contract interpretation command us to hold that for the purpose of the standing issue that we are called on to decide, the scope of Patent Rights is not ambiguous. Because the patents in suit do not appear in Schedule A, they were not transferred to DGTI.
Nova urges us to effectively read Schedule A out of the Contribution Agreement. It posits that section 9.07 of the Contribution Agreement reveals that Schedule A does not matter at all. To support this argument, Nova selectively recites a portion of section 9.07, which states, “omission of an item from one or more schedules shall not give rise to an implication that DGTI has rights less than those otherwise provided for in this Agreement.” Appellant Br. 11 (quoting J.A. 5046). Based on this snippet of section 9.07, Nova concludes that the contents of the schedules are not controlling. We disagree. Section 9.07 provides,
9.07 Schedules. Each of the schedules referenced within this Agreement, prospectively including any updates or amendments thereto, is deemed incorporated herein by *915 reference. While care shall be taken in the provision of the schedules, it is recognized that inadvertent errors may occur. Accordingly, inclusion of an item on one or more schedules shall not give rise to rights or an implication that DGTI has rights greater than those expressly provided for in this Agreement. Likewise, omission of an item from one or more schedules shall not give rise to an implication that DGTI has rights less than those otherwise provided for in this Agreement. Upon their mutual recognition of an error in one or more schedules, the parties will amend the erroneous item(s) on the affected schedule(s).
J.A. 5046. As it appears in the very first sentence, this section of the contract is meant to incorporate the schedules into the agreement. That alone gives us pause with regards to Nova’s argument, for it would seem odd if the parties intended to incorporate the schedules into the agreement and yet declare them meaningless in the very same section of the agreement. And of course, the remaining language of section 9.07 confirms that the schedules are not meaningless. Section 9.07 provides that the schedules carry meaning unless the parties (Dow and DGTI) agree that a mistake or inadvertent omission has been made. Far from supporting Nova’s interpretation which uses section 9.07 to wipe out Schedule A-section 9.07 reveals that Dow and DGTI intended the schedules to be of great significance, so much so that they devised a contingency plan to address inadvertent mistakes that might occur during their creation and maintenance. And, of course, even Nova does not seriously contend that any mistake or inadvertent omission has occurred with respect to Schedule A and the patents in suit. Thus, section 9.07 does not provide any basis for us to look beyond the four-corners of the contract.
Nor do we see any basis for Nova’s argument that Schedule A is somehow untrustworthy. Kathleen Maxwell, a paralegal at Dow, testified that she was in charge of preparing and maintaining the schedules to the Contribution Agreement from 2002 to September, 2005, three months before this litigation began. Maxwell testified that she prepared Schedule A in 2002 by looking up the patents owned by DGTI in Dow’s Intellectual Property Management System (“IPMS”), which is “a database that holds patent records and agreement records” and is “managed by [Dow’s] Patent Department.”[4] J.A. 7111. According to Maxwell, she updated Schedule A in 2004 in the same way, by looking up the patents in IPMS. From 2002 to 2005, Maxwell recalled, many patents were added to Schedule A; indeed, the number of patents included in Schedule A rose from approximately 5,600 to about 7,800. And yet, here is what Maxwell had to say about whether anything was ever taken out of Schedule A:
Q. And do you ever recall removing any patents from the patent rights schedule?
A. No, I do not.
Q. And do you ever recall anyone else removing any patents from the patent rights schedule?
A. No, I do not.
*916 Q. Do you ever recall anybody asking you to remove patents from the patent rights schedule?
A. No, I do not.
J.A. 7111.[5] Finally, Maxwell testified that the patents in suit did not appear in Schedule A while she was in charge, thus dispelling any doubt that Dow might have erased the patents in suit from Schedule A in anticipation of litigation between September and December of 2005 (when this suit was filed). The district court expressly found that Maxwell was credible, Dow Chem., 726 F.Supp.2d at 463, and this aspect of the district court’s decision is virtually unassailable on appeal. Nova’s suggestion that Schedule A is somehow unreliable, therefore, cannot be squared with the record before us.[6]
In sum, the terms of the Contribution Agreement unambiguously show that the patents in suit were not transferred to DGTI. Moreover, Nova’s arguments with respect to the relevance and authenticity of Schedule A are unfounded. Because the contract terms are clear, we may not look beyond them to analyze Dow’s ownership of the patents in suit. Nova failed to overcome the presumption of title created by the record of assignment filed with the PTO. The district court correctly determined that Dow has standing to enforce the patents in suit.[7]
*917 B. Indefiniteness
The district court also correctly found that the patents in suit were not indefinite.[8] A patent specification must “conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.” 35 U.S.C. § 112, ¶ 2. This requirement is satisfied where “one skilled in the art would understand the bounds of the claim when read in light of the specification.... ” Exxon Research & Eng’g Co. v. United States, 265 F.3d 1371, 1375 (Fed.Cir.2001). A claim is not indefinite merely because it is difficult to construe. Id. To be indefinite, a claim term must be such that “no narrowing construction can properly be adopted” to interpret the claim. Id. Indefiniteness is a question of law that this court reviews de novo. Star Scientific, Inc. v. R.J. Reynolds Tobacco Co., 655 F.3d 1364, 1373 (Fed.Cir.2011); Bancorp Servs., LLC v. Hartford Life Ins. Co., 359 F.3d 1367, 1371 (Fed.Cir.2004); Exxon, 265 F.3d at 1376.
The patents in suit are directed at polymer compositions. The only asserted independent claim of the '053 patent is representative claim 6, which recites,
6. An ethylene polymer composition comprising
(A) from about 10 percent (by weight of the total composition) to about 95 percent (by weight of the total composition) of at least one homogeneously branched linear ethylene/a-olefin interpolymer having:
(i) a density from about 0.89 grams/cubic centimeter (g/cm[3]) to about 0.935 g/cm[3],
(ii) a molecular weight distribution (MW/MN) from about 1.8 to about 2.8,
(iii) a melt index (12) from about 0.001 grams/10 minutes (g/10 min) to about 10 g/10 min,
(iv) no high density fraction,
(v) a single melting peak as measured using differential scanning calorimetry, and
(vi) a slope of strain hardening coefficient greater than or equal to 1.3; and
(B) from about 5 percent (by weight of the total composition) to about 90 percent (by weight of the total composition) of at least one heterogeneously branched linear ethylene polymer having a density from about 0.93 g/cm3 to about 0.965 g/cm3.
'053 patent col.16 11.4-26 (emphasis added). Claim 1, the only independent claim of the *918 '023 patent, claims a different ethylene polymer, but it too recites a particular component with “a slope of strain hardening coefficient greater than or equal to 1.3.”[9] '023 patent col.1611.30-31.
It is the “slope of strain hardening” (“SHC”) coefficient that is at the center of Nova’s indefiniteness argument. The SHC coefficient is a new Dow construct, not previously known in the art, defined by the patents in suit as the slope of a material’s strain hardening multiplied by the melt index raised to the 0.25 power.[10] '053 patent col.6 11.45-50. The patents in suit teach that in order to determine a material’s slope of strain hardening, one must first obtain a “stress/strain curve,” which results when the tensile properties of the test sample is tested on a tensile tester. Id. at col.6 11.24-29. The slope of the strain hardening is then “calculated from the resulting tensile curve by drawing a line parallel to the strain hardening region of the resulting stress/strain curve.” Id. at col.6 11.27-29.
Nova argues the patents in suit do not adequately teach how one must determine the value of the SHC coefficient for the claimed polymer because 1) the patents in suit do not contain a schematic depiction of the tensile curve of the claimed material, and 2) the patents in suit do not disclose the suitable measurement units for measuring the value of the SHC coefficient. Based on all the evidence that is presented to us in the record, however, we agree with the district court’s determination that the patents in suit are not indefinite.
Nova first argues that the patents in suit do no include a schematic example of the strain/stress curve, and posits that the patents in suit are indefinite as a result. In particular, Nova suggests that without the aid of a drawing, one of ordinary skill in the art would not know at what part along the stress/strain curve the slope must be measured. We disagree. It is true that the patents in suit state that “FIG. 1 shows the various stages of the stress/strain curve used to calculate the slope of strain hardening,” and yet the patents in suit do not, for whatever reason, include the promised drawing. '053 patent col.6 11.40-41. But that does not suggest that one of ordinary skill in the art would not be able to determine the slope of the strain hardening for the SHC coefficient. Nova’s own expert witness, Dr. Fuller, agreed with Dow’s attorney that a typical stress/strain curve was “very, very well known [to a] person of ordinary skill in the art ... who worked with semi-crystalline polymers and polyethylene,” and that one of ordinary skill in the art would come across similar curves in relevant textbooks. J.A. 3564-65. The mere fact that Figure 1 was missing from the patents in suit, therefore, does not render them indefinite.[11] And more importantly, Dow established that one of ordinary skill in the art would know at which particular part along the curve the slope of the stress/strain curve should be measured. The patents in *919 suit teach that strain hardening occurs, or is reflected, at a specific region of the stress/strain curve:
The strain hardening occurs after the sample has pulled its initial load ((i.e., stress) usually with little or no elongation during the initial load) and after the same has gone through a slight drawing stage (usually with little or no increase in load, but with increasing elongation (i.e., strain)). In the strain hardening region, the load and the elongation of the sample both continue to increase. The load increases in the strain hardening region at a much lower rate than during the initial load region and the elongation also increase, again at a rate lower than that experienced in the drawing region.
'053 patent col.6 11.80-89. In other words, although there are multiple “regions” on a stress/strain curve, only one region on the curve is the “strain hardening region,” where the slope of the curve must be measured.
Nova objects that the strain hardening region is itself a curve, not a straight line. It points to the testimony of Dow’s own expert witness, Dr. Hsiao, who indeed admitted that most strain hardening data samples gathered from the stress/strain test reveal some curvature (when graphed), and that curves do not have a single slope. Nova thus argues that the patents in suit are indefinite. We disagree. Dr. Hsiao explained that one of ordinary skill in the art would understand that during the initial portion of the strain hardening region, there is a mixture of drawing effects and strain hardening effects. During the draw region, the material deforms without increasing the load. Beyond that point, the test sample hardens, and, eventually, it breaks. According to Dr. Hsiao, one of ordinary skill in the art would know that the slope of the hardening curve would have to be measured at its maximum value, which reflects the best tensile performance of the material.
Nova further notes that “Dow’s internal flies and later disclosures contain multiple definitions for where the slope of strain hardening for SHC should be determined.” Appellant Br. 25. In particular, Nova points to some of Dow’s internal documents that reveal Dow indeed experimented with four different methods to measure the slope of the strain hardening curve. Nova argues, accordingly, that there is no single method for one of ordinary skill in the art to measure the slope, and that the failure of the patents in suit to identify one distinct method renders them indefinite. Again, we disagree. To begin with, whether Dow used various methods to measure the slope of the strain hardening curve is of questionable significance because there is no evidence to suggest that the experi-mentations necessarily involved practicing the claimed method. And in any event, “[t]he claims are not indefinite even if some experimentation is required to determine the exact [scope of the claims].” Enzo Biochem, Inc. v. Applera Corp., 599 F.3d 1325, 1336 (Fed.Cir.2010), cert. denied, — U.S. -, 131 S.Ct. 3020, 180 L.Ed.2d 844 (2011); see also Exxon, 265 F.3d at 1379 (“Provided that the claims are enabled, and no undue experimentation is required, the fact that some experimentation may be necessary to determine the scope of the claims does not render the claims indefinite.”). We already noted, however, that Dow has established that one of ordinary skill in the art would know that the maximum slope of the stress/ strain curve was the appropriate value for calculating the SHC coefficient. At best, Nova has shown that other regions in the slope may also be measured. But that does not necessarily suggest that one of ordinary skill in the art would not realize *920 that the maximum slope leads to the most appropriate reading of the strain hardening slope for the purposes of the patents in suit, or that it would be too difficult for one or ordinary skill in the art to make a few measurements and determine, based on the result, what the scope of the invention is. In other words, the mere fact that the slope may be measured in more than one way does not make the claims of the patent invalid. See Exxon, 265 F.3d at 1375.
Next, Nova argues that the patents in suit are indefinite because they do not disclose the unit of measurement for the SHC coefficient. It is true that the patents in suit do not specify any particular unit for the SHC coefficient. But the specification teaches that the stress/strain test is conducted with an Instron Tensile Tester “at a crosshead speed of 1 inch/minute.” '053 patent col.6 1.26. Experts for Dow and Nova agreed that the user manual for the Instron Tensile Tester, available when the patents in suit were filed, specified that when the crosshead speed is inches per minute, the units for load and elongation are pounds and inches (English units), unless expressly specified otherwise. And, the manual also showed that when the user conducts the stress/strain test using crosshead speeds in inches per minute, the output measurement is reported in English units. Consistent with these instructions, Table 3 of the patents in suit also reports the output of the Instron Tensile Tester (e.g., yield, tensile strength, and toughness) in English units. Because the specification (directly in Table 3 and indirectly via the Instron manuals) teaches that all measurement units that are relevant to the determination of the slope of strain hardening are made in English units, one of ordinary skill on the art would also realize that the slope of the strain hardening should be determined in English units.
Finally, Nova argues that one of ordinary skill in the art would not realize that the slope of the strain hardening region should be measured in English units because the equation for the SHC coefficient also incorporates the melting index, and the patents in suit report the melting index in metric, not English, units. See '053 patent col.6 1.47. We disagree. Nova has not presented any evidence that shows an equation, for a proprietary coefficient indeed, may not combine variables measured in different measurement systems. And in any event, the test for indefiniteness is not whether the scope of the patent claims is easy to determine, but whether “the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree.... ” Exxon, 265 F.3d at 1375. As we have already explained, one of ordinary skill in the art would realize that the slope of the strain hardening, as defined in the patents in suit, should be measured and reported in English units. Therefore, Nova’s final argument regarding indefiniteness fails. In sum, because one of skill in the art would understand the bounds of the claims, the district court correctly rejected Nova’s indefiniteness challenge.[12]
C. Infringement
Nova’s final challenge to the district court’s denial of its motion for judgment as a matter of law targets the jury’s finding of infringement. We review the district court’s denial of Nova’s motion for *921 judgment as a matter of law under the standard of review of the regional circuit. ACCO Brands, Inc. v. ABA Locks Mfr. Co., 501 F.3d 1307, 1311 (Fed.Cir.2007). The Third Circuit reviews de novo a district court’s denial of judgment as a matter of law. McKenna v. City of Philadelphia, 649 F.3d 171, 176 (3d Cir.2011). Infringement is a question of fact, and we review the jury’s verdict of infringement for substantial evidence. Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1202 (Fed.Cir.2010).
Here, the jury’s verdict of infringement is supported by substantial evidence. As we already stated, the plastic claimed in the patents in suit contains two components, Component A and Component B. There is no dispute that Nova’s accused product contains Component A. The infringement dispute revolves around one particular limitation in the composition of Component B.[13] Specifically, Nova argues that Dow did not present sufficient evidence that showed the high density component of Nova’s accused product, referred to as “HD fraction,” is “heterogeneously branched,” as required by the patents in suit. '053 patent col.16 1.24. We disagree. Dr. Soares, Dow’s expert witness, testified that he conducted two different analyses to determine whether Nova’s [¶] fraction is heterogeneously branched. First, Dr. Soares stated that he studied Nova’s manufacturing process, including Nova’s own modeling of its reactor, and explained that due to the non-uniformity of the reactor zone (the ratio between the ethylene and octane in various areas surrounding the area in the reactor where the [¶] fraction is formed), molecules with different amounts of branching are produced. In other words, he explained, the [¶] fraction is heterogeneously branched. Second, Dr. Soares testified that he performed a “cross fractionation” analysis, which also revealed that the [¶] fraction is heterogeneously branched.
Nova argues that whether Component B is “heterogeneously branched” is not relevant because the district court construed the term “heterogeneously branched” as having “branching different from and broader than the homogenously branched component.” Appellant Br. 63; see also J.A. 110. Nova argues, rather, that in order to evaluate infringement, one must “compare the relative distribution exhibited by Nova’s [HD Fraction].” Appellant Br. 64. We are skeptical of the logic of this hypertechnical analysis because it implies that the district court erred in its claim construction — which is not challenged on appeal. But in any event, Dr. Soares testified that the particular characteristics of the mixture of ethylene and octane in Nova’s reactors results in “different branching levels” or “broadening of the distribution [of branching]” in the [¶] fraction. J.A.2078-79. We are persuaded that Dr. Soares’s testimony gave the jury sufficient justification to find that the accused polymer has “branching different from and broader than [the] homogeneously branched [component].” J.A. 110. Therefore, whether the infringement analysis is performed with attention to the phrase “heterogeneously branched” or by focusing on the specific language of the district court’s claim construction, it leads to the same result. Substantial evidence supports the jury’s finding of infringement in Dow’s favor.
Conclusion
For the foregoing reasons, we affirm the judgment entered against Nova.
AFFIRMED.

. Nova also argued that the patents in suit were invalid for obviousness. The jury found that the patents were not obvious. Nova does not appeal that determination.

. There is no dispute that other than the "loss of rights” limitation, the remaining language of the first sentence of section 1.07 is immaterial to the standing issue presented here. Therefore, we only focus on the phrase "loss of rights.”

. As we explain below, section 9.07 of the Contribution Agreement incorporates Schedule A into the agreement.

. Maxwell mistakenly entitled the Patent Rights schedule as "Schedule B.” The district court found that the typographical error did not have any substantive effect, and therefore, we see no reason to restate the analysis here. At any rate, we agree with the district court’s finding in this respect as well.

. The dissent argues that Schedule A cannot control because under section 2.01, the transfer of Patent Rights to DGTI was immediate, whereas Schedule A was not to be prepared until ninety days after the Contribution Agreement went into effect. Dissenting Op. at 926-27. But section 2.01 itself states that Patent Rights may include "rights [that] are owned or controlled by [Dow] on the Transfer Date or thereafter." J.A. at 5042 (emphasis added). Moreover, section 9.07 also demonstrates that Dow and DGTI allowed flexibility in editing the incorporated schedules (We assume, in line with Kathleen Maxwell’s testimony, that any editing would effect transfer in only one direction, from Dow to DGTI.). Thus, unlike the dissent, we do not understand the "hereby conveys ...” phrase in section 2.01 to undermine the significance of Schedule A.

. The Contribution Agreement also incorporates a document entitled Schedule D, which was to contain a list of “Excluded Intangible Assets.” J.A. 5040, ¶ 1.03. Dow and Nova dispute the content of Schedule D, and each hypothesizes how the content of Schedule D should affect the standing analysis. There is nothing in the Contribution Agreement, however, that suggests Schedule D is related to the scope of Patent Rights, and so we see no need to explore the issue any further.

. As we explained, unlike the dissent, we believe that the terms of the Contribution Agreement are not ambiguous. But even if we were to look beyond the four-corners of the contract, we would find no basis for the dissent's suggestion that the extrinsic evidence counsels reversing the district court's standing determination. We note that the cornerstone of the dissent’s analysis of the extrinsic evidence is a chain of Dow's intra-office email communications. The content of the emails is disputed, however, and, as we read them, they do not conclusively establish that Dow transferred the patents in suit. The dissent’s interpretation of the e-mails is based mainly on one specific e-mail, in which one of Dow’s attorneys (Mr. Bruce Kanuch) suggests that the patents that were then in litigation remain with Dow. Dissenting Op. at 929-30 (citing J.A. 5663). The dissent infers from this one e-mail that the remaining patents were transferred. Dissenting Op. at 930-31. But the e-mail itself says nothing about what should happen to the patents in suit, and in any event, there is no evidence that the suggestion in this one e-mail was ever adopted by or incorporated into the Contribution Agreement. It is true that the next e-mail in the chain states that "the issue" was addressed by adding the phrase “loss of rights” to the contribution Agreement, J.A. 5663, but this subsequent e-mail does not suggest that the phrase "loss of rights” was limited to a loss of standing in then-pending litigation. On the contrary, it is entirely plausible (and in our view, likely) that “the issue” addressed by the addition of the phrase "loss of right” was Dow’s "legal standing to bring and/or maintain [suit].” Id. (emphasis added). Therefore, as the record before us stands, the e-mails do not *917 shed much light onto the meaning of "loss of rights." We also disagree with the dissent's choice to foray into analyzing Dow’s tax incentives in structuring the Contribution Agreement. In our view, the record does not reveal what, if any, tax benefits Dow received from the purported transfer of the patents in suit. Even if the evidence did reveal some tax benefits, however, it will not tell us much about the parties' objective intent in entering into the Contribution Agreement when the agreement took effect. Finally, even if we were in a position to consider the totality of the extrinsic evidence (including the e-mails and the alleged tax incentives) for the first time on appeal, we would find nothing more compelling in the record than Schedule A-which at the very least should serve as a telling piece of extrinsic evidence. In sum, we respectfully disagree both with the dissent’s decision to take on the analysis of the extrinsic evidence in the first place, and also with regard to the results.

. Because the district court provided a construction to the jury, which was the only basis upon which the jury could reach the conclusion it did, we do not need to reach the question of whether it was error to submit the question of indefiniteness to the jury: Even had the district court not done so, the outcome would be no different.

.Although the patents in suit disclose different polymer combinations, the differences between them are not material to our analysis. For the sake of convenience, we quote language from the '053 patent throughout our opinion but still use the phrase "patents in suit” to make clear that our analysis applies to the asserted claims of the '023 patent as well.

. SHC = (slope of stain hardening) * (I2) °-25. '053 patent col.6 1.47.

. We note that the patents in suit merely state that Figure 1 was intended to depict "the various stages of the stress/strain curve,” but they do not necessarily suggest that Figure 1 would depict the specific point along the curve at which the slope should be measured. '053 patent col.6 1.40.

. Nova also argues, essentially based on the same contentions made in its indefiniteness appeal, that the patents in suit do not meet the written description requirement of 35 U.S.C. § 112, ¶ 1. Based on our analysis above, we also reject Nova’s written description arguments.

. The remaining limitations of the patents in suit that are relevant to Component B are satisfied by the high density component of Nova’s accused product. We do not address them here.

. Although the Contribution Agreement was effective January 1, 2002, it was not actually signed by Dow and DGTI until February 17 and 7, 2002, respectively.