# United States Court of Appeals
# for the Federal Circuit

---

**BRYNDON FISHER, BRUCE REID, ERICK SHIPMON, DERIVATIVELY ON BEHALF OF FEDERAL NATIONAL MORTGAGE ASSOCIATION,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2024-1167

---

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00608-MMS, Senior Judge Margaret M. Sweeney.

-------------------------------------------------

**BRUCE REID, BRYNDON FISHER, DERIVATIVELY ON BEHALF OF FEDERAL HOME LOAN MORTGAGE CORPORATION,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2024-1168

————————————

Appeal from the United States Court of Federal Claims in No. 1:14-cv-00152-MMS, Senior Judge Margaret M. Sweeney.

————————————

Decided:  August 12, 2025

————————————

PATRICK VALLELY, Shapiro Haber & Urmy LLP, Boston, MA, argued for plaintiffs-appellants.  Also represented by AMBER LOVE SCHUBERT, ROBERT SCHUBERT, Schubert Jonckheer & Kolbe LLP, San Francisco, CA.

GERARD SINZDAK, Appellate Staff, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee.  Also represented by SIMON GREGORY JEROME, CHARLES W. SCARBOROUGH.

————————————

Before PROST, REYNA, and STARK, *Circuit Judges*.

STARK, *Circuit Judge*.

Owners of shares of the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac") appeal a judgment of the United States Court of Federal Claims ("Claims Court") granting the government's motion to dismiss their derivative suit, which alleged a takings claim in violation of the Fifth Amendment.  We affirm.

I

Fannie Mae and Freddie Mac (together, "the Enterprises") purchase and guarantee mortgages originated by private banks.  J.A. 44.  The Enterprises were originally part of the federal government but are now for-profit companies owned by private shareholders.  J.A. 144-45.

In the housing market crash of 2008, the Enterprises suffered substantial financial losses. J.A. 9. Congress then enacted the Housing and Economic Recovery Act of 2008 ("HERA"), which created the Federal Housing Finance Agency ("FHFA"). The FHFA is an independent agency tasked with overseeing the Enterprises. *See* 12 U.S.C. § 4511(b).

Among other things, HERA allows the FHFA to act as conservator of the Enterprises in certain circumstances. *See id.* § 4617. When the FHFA acts as conservator, HERA's Succession Clause is triggered, which provides that the FHFA "shall, as conservator or receiver . . . immediately succeed to – (i) all rights, titles, powers, and privileges of the [Enterprises], and of any stockholder . . . with respect to the [Enterprises] and the assets of the [Enterprises]." *Id.* § 4617(b)(2)(A)(i). This gives the FHFA authority to "transfer or sell any asset" of the Enterprises upon a determination that doing so is "in the best interests of the [Enterprises] or [FHFA]." 12 U.S.C. § 4617(b)(2)(G), (b)(2)(J)(ii). As the Supreme Court has explained, an "FHFA conservatorship . . . differs from a typical conservatorship in a key respect. . . . [W]hen the FHFA acts as a conservator, it may aim to rehabilitate the regulated entity in a way that, while not in the best interests of the regulated entity, is beneficial to the Agency and, by extension, the public it serves." *Collins v. Yellen,* 594 U.S. 220, 238 (2021).

On September 6, 2008, the FHFA's Director placed the Enterprises into conservatorship. J.A. 605. The Enterprises' respective Boards of Directors consented to the conservatorship. J.A. 606. The next day, September 7, 2008, the United States Department of Treasury ("Treasury") executed a Preferred Stock Purchase Agreement ("PSPA") with the Enterprises, pursuant to which Treasury received one million shares of newly issued preferred stock in each of Fannie Mae and Freddie Mac ("Government Preferred Stock"), that was senior in priority to all other Enterprise

stock. J.A. 475, 508, 609. The Government Preferred Stock initially entitled the government to fixed dividends and a liquidation preference of $1 billion per Enterprise, meaning that upon liquidation of either Enterprise the government would be entitled to a preferential pay-out of $1 billion in addition to the sum of all draws made by that Enterprise against Treasury's funding commitment. J.A. 594, 610, 630. The PSPA also provided Treasury the option to purchase up to 79.9% of the common stock of each Enterprise at a nominal price. J.A. 45.

In exchange, the PSPA entitled each Enterprise to draw up to $100 billion from Treasury, as needed. "As needed" was defined in the PSPA such that during quarters in which an Enterprise's liabilities exceed its assets, the Enterprise could draw on Treasury's commitment in an amount equal to the difference between those liabilities and assets, in order to ensure it maintained a positive net worth. J.A. 594, 609-11. Over time, the FHFA and Treasury agreed to double Treasury's funding commitment, allowing each Enterprise to draw up to $200 billion. *See Collins*, 594 U.S. at 232. By June 2012, the Enterprises had drawn a total of $187.5 billion from Treasury's funding commitment, giving Treasury a liquidation preference of $189.5 billion, and requiring the payment of dividends to Treasury of $19 billion annually. *See id.* at 233; *see also* J.A. 58, 137.

Between 2008 and 2012, the FHFA and Treasury amended the PSPA multiple times. J.A. 611. Relevant to this appeal, on August 17, 2012, the FHFA and Treasury executed a Third Amendment to the PSPA ("Third Amendment"). J.A. 627. Under the terms of the Third Amendment, the Enterprises were required to pay Treasury a quarterly dividend equal to the amount which each Enterprise's total assets (excluding Treasury's funding commitment) exceeded the sum of its total liabilities and a capital buffer. *See Collins*, 594 U.S. at 233-34; J.A. 627. This requirement is known as the "net worth sweep" and it

replaced the PSPA's original fixed-rate dividend formula. J.A. 46-47, 509. The net worth sweep resulted in a transfer of "essentially all profits and losses from the [Enterprises] to the Treasury." J.A. 628. The Third Amendment, hence, had the effect of diverting all expected dividends from common and preferred shareholders of the Enterprises to Treasury. *See* J.A. 509-10 (Claims Court citing Treasury memorandum anticipating that "every dollar of earnings that [the Enterprises] generate will be used to benefit taxpayers") (alteration in original).

Appellants, who were the plaintiffs in the trial court, are owners of Enterprise preferred stock. J.A. 79. On behalf of the Enterprises, they filed a shareholder derivative suit challenging the Third Amendment as an unconstitutional government taking without just compensation. J.A. 3. Appellants contend that, via the net worth sweep, "Treasury reaped a windfall of perhaps $81 billion" from Fannie Mae and $52.35 billion from Freddie Mac, for a total of more than $133 billion, "in comparison to what it would have received absent any changes to the PSPA." J.A. 510, 543. By their derivative claim, Appellants sought to recover these funds for the Enterprises (which could indirectly benefit them as shareholders).

The government moved to dismiss Appellants' derivative takings claim based on our holding in *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274 (Fed. Cir. 2022).[1] In *Fairholme*, 26 F.4th at 1301-02, we addressed a shareholder derivative takings claim brought by a different shareholder, Andrew T. Barrett, who alleged that the net worth sweep was unconstitutional. Citing *Collins*

---

[1]    *Cert denied*, 143 S. Ct. 563, *and cert. denied sub nom. Barrett v. United States*, 143 S. Ct. 562, *and cert. denied sub nom. Owl Creek Asia I, L.P. v. United State*s, 143 S. Ct. 563, *and cert. denied sub nom. Cacciapalle v. United States*, 143 S. Ct. 563 (2023).

*v. Yellen*, 594 U.S. 220 (2021), which held that certain actions taken by the FHFA as conservator were within its discretion under HERA, we dismissed the derivative claim for failure to state a claim. *Fairholme*, 26 F.4th at 1303. We reasoned that when it passed HERA in 2008, Congress "gave the FHFA the unrestricted authority to place the Enterprises into conservatorship or receivership. . . . As of at least 2008, then, the Enterprises lost their right to exclude the government from their property, including their net worth." *Id.* at 1303. We concluded that "[w]ithout this right to exclude, the Enterprises lack any cognizable property interest on which [the shareholders] may base a derivative Fifth Amendment takings claim." *Id.*

Here, the Court of Federal Claims concluded that "all three counts of [P]laintiffs' second amended complaint present claims of a type that were unequivocally rejected by the Federal Circuit in *Fairholme*." J.A. 6. Accordingly, because "binding precedent compels the dismissal of plaintiffs' claims," it granted the government's motion to dismiss. J.A. 3, 7. Appellants timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

II

Our review of the Claims Court's grant of a motion to dismiss, pursuant to Rule of the Court of Federal Claims 12(b)(6), is *de novo*. *See Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). We accept as true all well-pled factual allegations in the operative complaint and draw all reasonable inferences in favor of the plaintiffs. *See id.* Whether a claim is barred by the doctrine of claim preclusion is a question of law, which we review de novo. *E.g.*, *Faust v. United States*, 101 F.3d 675, 677 (Fed. Cir. 1996) (further observing that the doctrine of claim preclusion is sometimes specified by the term "res judicata," but using "claim preclusion" instead of "the more ambiguous term 'res judicata,'" as the latter can sometimes contemplate either claim preclusion or issue preclusion).

## III

The Claims Court granted the government's motion to dismiss because it viewed our decision in *Fairholme* as compelling it to do so. J.A. 3. The court saw Appellants' claims as indistinguishable from the derivative claims we evaluated and ordered dismissed in *Fairholme*, making *Fairholme* governing, dispositive precedent.

On appeal, Appellants do not dispute that if *Fairholme* remains binding precedent, the basic requirements for claim preclusion are satisfied. They predicate their appeal, instead, on two purported exceptions to application of claim preclusion. Specifically, Appellants contend that the *Fairholme* plaintiffs did not adequately litigate the derivative takings claim, so it would offend due process to bind Appellants to our disposition of that deficiently litigated claim. Second, Appellants argue that a Supreme Court decision issued subsequent to *Fairholme*, *Tyler v. Hennepin County*, 598 U.S. 631 (2023), transformed takings law to such an extent that our *Fairholme* analysis can no longer stand. We address, and reject, both of these contentions below.

## A

Appellants first argue that claim preclusion cannot preclude their derivative takings claim because the Enterprise shareholders who litigated the claim in the earlier litigation were not adequately represented. Specifically, they assert that "the *Fairholme* plaintiffs failed to argue on appeal the merits of the derivative takings claim" and, consequently, "this Court decided the merits of that claim without the benefit of adequate briefing and argument." Open. Br. at 14. We disagree.

"Generally, claim preclusion applies where: (1) the parties are identical or in privity; (2) the first suit proceeded to a final judgment on the merits; and (3) the second claim is based on the same set of transactional facts as the first." *First Mortg. Corp. v. United States*, 961 F.3d 1331, 1338 (Fed. Cir. 2020) (cleaned up). The parties agree that all of

these elements are met.  In particular, *Fairholme* already resolved that the Enterprises lack a cognizable property interest upon which a takings claim could be based.  *See Fairholme*, 26 F.4th at 1274.

This holding, if applied to Appellants, is fatal to their takings claim; as Appellants recognize, "a threshold issue for any takings claim is whether the plaintiff has identified 'a property interest protected by the Fifth Amendment.'" Open. Br. at 19 (quoting *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984)).  And because "the plaintiff in a derivative suit represents the corporation, which is the real party in interest," *In re Sonus Networks, Inc. S'holder Derivative Litig.*, 499 F.3d 47, 63 (1st Cir. 2007), the Enterprises were the real parties in interest when we evaluated Mr. Barrett's derivative claim in *Fairholme*, and they remain the real parties in interest here.  *See Cottrell v. Duke*, 737 F.3d 1238, 1243 (8th Cir. 2013) (noting that judgment rendered on derivative claim generally "preclude[s] subsequent litigation [of that claim] by the corporation and its shareholders"); *In re Career Educ. Corp. Derivative Litig.*, C.A. No. 1398-VCP, 2007 WL 2875203, at *10 (Del. Ch. Sept. 28, 2007) ("Because the corporation is the true party in interest in a derivative suit, courts have precluded different derivative plaintiffs in subsequent suits.").

Appellants argue, nonetheless, that claim preclusion cannot bar their claim because their interests were not adequately represented in *Fairholme*.  They contend that the *Fairholme* plaintiffs "failed to argue the merits of a derivative takings claim and failed to present to this Court any analysis of the relevant background principles as to the Enterprises' property interests."  Open. Br. at 21 n.5.  They insist that the *Fairholme* plaintiffs, who also pled direct claims to entitlement to recovery of monies from the government, suffered from a conflict-of-interest that caused them to "abandon" Mr. Barrett's derivative takings claim on appeal.  *Id.* at 12 n.3.  Appellants are wrong.

While we have recognized that in the context of a class action "absent class members may later object to a res judicata or collateral estoppel bar on grounds of due process, for example, on the grounds that the absent class members were inadequately represented in the prior action," *Beer v. United States*, 671 F.3d 1299, 1305 (Fed. Cir. 2012), *overruled-in-part and vacated-in-part on other grounds by* 696 F.3d 1174 (Fed. Cir. 2012) (*en banc*), this is, at most, a narrow exception to claim preclusion, and it is one we have not applied outside the context of a class action. In any event, assuming the exception can be applicable here, *see Papilsky v. Berndt*, 466 F.2d 251, 260 (2d Cir. 1972) (stating that "fundamental considerations of fairness and justice demand that the representation be adequate" in earlier case in order for later shareholder derivative suit to be barred by claim preclusion), it is a narrow one, and the circumstances presented here do not come within that narrow exception.

We agree with the First Circuit that a representation exception to claim preclusion may apply only where the representation in the prior case was "'so grossly deficient as to be apparent to the opposing party.'" *In re Sonus Networks, Inc.*, 499 F.3d at 66 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 42(1)(e) cmt. f). Mr. Barrett's representation in *Fairholme* was not "so grossly deficient." Indeed, in the Claims Court, Mr. Barrett *prevailed* on the government's motion to dismiss. *See Fairholme Funds*, 26 F.4th at 1301-02. While he then lost on appeal, it was only after defending the trial court's ruling before us. *See Fairholme Funds, Inc. v. United States*, Appeal No. 20-1912 ("*Fairholme* Appeal"), ECF No. 38 (Supplemental Open. Br. of Fairholme Funds Plaintiffs) at 21-31 (Fed. Cir. Oct. 23, 2020); *Fairholme* Appeal, ECF No. 58 (Joint Rep. Br. of Plaintiff-Appellant Private Shareholders), 2021 WL 824966, at *90-105 (Fed. Cir. Feb. 26, 2021). Then, after we reversed the Claims Court, Mr. Barrett filed a petition for a writ of certiorari in the Supreme Court, making essentially the same arguments that Appellants now press

before us. *See Barrett v. United States*, No. 22-99, 2022 WL 3044828 (July 22, 2022).

Contrary to Appellants' assertion, *see* Open. Br. at 12, at no point did Mr. Barrett or the other *Fairholme* plaintiffs "abandon" the derivative claim. That Appellants disagree with the strategic decisions made by the *Fairholme* plaintiffs, and even accuse them of suffering from a conflict of interest (alleging they preferred to prevail on their direct claims, which could have yielded a direct payment to shareholders, rather than on derivative claims, which at best would result in payment to the Enterprises),[2] does not demonstrate grossly deficient representation, especially in light of the realities of how the *Fairholme* case was actually litigated, as we have described above. *See Hatch v. Trail King Indus., Inc.*, 699 F.3d 38, 45 (1st Cir. 2012) ("It is axiomatic that claim preclusion doctrine requires a party to live with its strategic choices.") (cleaned up); *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 199 (2d Cir. 2010) ("Where a litigant selected a litigation strategy he now regrets, . . . his choice of that strategy will not prevent the application of preclusion against him.") (internal quotation marks omitted).

This conclusion is bolstered by two further points. First, we agree with the Second Circuit that in a shareholder derivative suit, "[a] contest upon the merits is presumed to indicate that the plaintiff-stockholder vigorously prosecuted the claim on behalf of the corporation." *Papilsky*, 466 F.2d at 258. In *Fairholme*, 26 F.4th at 1301,

---

[2]    Oral Arg. at 0:27-0:44 (Appellants' counsel arguing "plaintiffs in *Fairholme* were not adequate representatives of the company because they made a strategic decision on appeal to abandon their derivative[] taking claim and instead advocate principally for their direct claims, which were more valuable to them").

the Claims Court considered the merits of the derivative claim – the identical claim Appellants press here – and we did the same on appeal. Appellants have not rebutted the resulting presumption that Mr. Barrett vigorously prosecuted the claim on behalf of the Enterprises. Second, Appellants themselves were heard from directly in *Fairholme*, as we granted their request to file an amicus brief, in which they made essentially the same arguments they offer us now. *See Fairholme* Appeal, ECF No. 49 (Fed. Cir. Nov. 24, 2020).

For all these reasons, we are not persuaded that the advocacy on behalf of the identical derivative claim in *Fairholme* was so grossly deficient as to render it unjust to apply claim-preclusive effect to our judgment in that case.

B

Appellants' next effort to evade the claim-preclusive impact of *Fairholme* is to argue that the Supreme Court's "landmark Takings Clause decision in *Tyler*," Open. Br. at 15, which was issued after *Fairholme*, transformed takings law, thereby eviscerating any preclusive effect *Fairholme* might otherwise have. In light of *Tyler*, they contend, "it is clear that this Court failed to apply the proper legal standard or adequately consider the property interests at stake." *Id.* at 18. According to Appellants, "[t]he *Fairholme* panel failed to consider the historical property rights afforded to companies in their own net worth, focusing only on recently enacted provisions of HERA that purported to define away the Enterprises' traditionally held property interests." *Id.* at 21. Again, we disagree.

We have observed that, generally, "there is no 'change of law' or fairness exception to prevent application of claim preclusion." *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1380 (Fed. Cir. 2008). We have also recognized, however, that "there may be a rare exception in cases involving momentous changes in important, fundamental

constitutional rights." *Id.* (internal quotation marks omitted).  Assuming such an exception exists,[3] it is not applicable here.

Our sister circuits have concluded that such an exception to claim preclusion can apply only when the intervening decision was so extraordinary as to be historic, such as "the overruling of the 'separate but equal' doctrine" in *Brown v. Board of Education*, 347 U.S. 483 (1954).  *Wilson v. Lynaugh*, 878 F.2d 846, 850-51 (5th Cir. 1989); *see also Precision Air Parts v. Avco Corp.*, 736 F.2d 1499, 1504 (11th Cir. 1984) ("[W]e did not apply res judicata to a state court judgment because three months after the prior judgment was issued the Supreme Court, . . . [*Brown v. Board*] overruled the separate but equal doctrine."); *Hernandez v. City of Lafayette*, 699 F.2d 734, 737 (5th Cir. 1983) ("The changed circumstances must be 'significant' and must create 'new legal conditions.'"); *Smith & Wesson Brands, Inc. v. Att'y Gen. of New Jersey*, 105 F.4th 67, 82 n.12 (3d Cir.

---

[3]    Appellants' reliance on *Dow Chemical Co. v. Nova Chemicals Corp. (Canada)*, 803 F.3d 620 (Fed. Cir. 2015), which they suggest sets out a three-part test for when an intervening change in law justifies departure from claim preclusion principles, *see* Reply Br. at 9-10, is unavailing.  That case describes exceptions to the "law of the case" doctrine, which applies prior to final judgment, not claim preclusion, which applies after final judgment.  *See id.* at 628; *see also Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) ("[T]he res judicata consequences of a final, unappealed judgment on the merits [are not] altered by the fact that the judgment may have been wrong or rested on a legal principle subsequently overruled in another case.").  Likewise unavailing is Appellants' reliance on *Bobby v. Bies*, 556 U.S. 825, 836 (2009), and the RESTATEMENT (SECOND) OF JUDGMENTS § 28(2), *see* Reply Br. at 8, both of which concern issue preclusion, not claim preclusion.

2024) (stating that departure from claim-preclusion principles requires "extraordinary circumstances").

*Tyler* did not alter takings law in such an exceptional way.  *See generally* Leading Case: Tyler v. Hennepin County, 137 HARV. L. REV. 310 (2023) (describing *Tyler* as merely "continu[ing] the trend of a robust Takings Clause").  That this is so is illustrated by the fact that our method of analysis in *Fairholme*, as well as our holding there, is entirely consistent with *Tyler*.

In *Tyler*, 598 U.S. at 636-37, the Supreme Court held that a state statute permitting the government to obtain a judgment against real property for unpaid real estate taxes, and to then sell the property and retain all proceeds – even those in excess of the unpaid tax debt and costs of the sale – constituted a taking.  The Supreme Court rejected the state's contentions that the statute made home ownership subject to the state's authority to proceed under the statute and that the homeowner never had a property interest to be free of the risk that the state might do so.  *See id.* at 638-39.  To have accepted this argument, the Supreme Court explained, would have allowed the government to "sidestep the Takings Clause by disavowing traditional property interests in assets it wishes to appropriate," simply by passing a statute.  *Id.* at 638.  In reaching its conclusion, the Supreme Court considered history and precedent, as well as "existing rules" and "understandings" about the particular property right asserted by the homeowner plaintiff.  *Id.*

We followed a very similar mode of analysis in *Fairholme*.  There, in assessing whether the Enterprises had a Fifth Amendment protected property interest that they were deprived of by the net worth sweep, we considered not only Congress' enactment of HERA, but also history and precedent, as well as existing rules and understandings.

We began by citing the Supreme Court's decision in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S.

419, 435-36 (1982), for the principle that "[t]he power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights." *Fairholme*, 26 F.4th at 1303. We then recounted our own precedents, which have long established that "regulated financial entities lack the fundamental right to exclude the government from their property when the government could place the entities into conservatorship or receivership." *Id.* (first citing *Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1074 (Fed. Cir. 1994) (finding that bank in receivership lacked property interest sufficient to support takings claim during "those times when the Comptroller [of Currency] could legally inspect the Bank or place it in receivership," as during those times "the Bank did not have the right to exclude the Comptroller"), and then citing *Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 958 (Fed. Cir. 1992) (rejecting takings claim brought by shareholder of savings and loan association because "a consequence of the regulated environment in which [the savings and loan association] voluntarily operated" is that it "lacked the fundamental right to exclude the government from its property at those times when the government could legally impose a conservatorship or receivership")).

Only after setting out this history and precedent, thereby exploring existing rules and understandings prior to HERA, did we turn to the impact of HERA's enactment in 2008. In doing so, we again relied on Supreme Court precedent, *Collins*, which describes how "HERA gave the FHFA very broad authority, as conservator, to act in ways that are not in the best interests of the Enterprises." *Fairholme,* 26 F.4th at 1303 (citing *Collins*, 594 U.S. at 237-38). We reasoned from these premises that because the Enterprises had no right to exclude the government from their property, and also lacked "the right to complain if and when the FHFA chose to elevate its interests, and the interests of the public, above the interests of the Enterprises," "they had no investment-backed expectation that the FHFA would protect their interests and not dilute their

equity." *Id.* We additionally pointed to the common-sense notion that the Enterprises had "consented to the conservatorship, and consented to one where the conservator had extremely broad statutory powers." *Id.* Again, our analysis is entirely consistent with the Supreme Court's mode of analysis in *Tyler*, and our holding differed from *Tyler*'s, properly, as the result of quite different facts.

Thus, Appellants have failed to show that *Tyler* involved such a momentous change to the understanding of a fundamental constitutional right as to allow Appellants to avoid the claim-preclusive impact of our decision in *Fairholme*. *Fairholme*'s reasoning was not, in any respect, inconsistent with *Tyler*.

## C

Finally, even if Appellants were able to escape the claim-preclusive effect of *Fairholme*, this panel would still be obligated to follow it as binding precedent. A panel of this Court is bound to follow precedential opinions issued by earlier panels. *See Sacco v. Dep't of Just.*, 317 F.3d 1384, 1386 (Fed. Cir. 2003). It is true that when a subsequent Supreme Court opinion overrules, expressly or implicitly, an earlier panel opinion, that development can be recognized by a subsequent panel, which is then no longer bound to follow the overruled panel precedent. *See Deckers Corp. v. United States*, 752 F.3d 949, 965 (Fed. Cir. 2014). But, for the reasons described above, we have rejected Appellants' contention that *Tyler* overruled *Fairholme*. Therefore, again, we affirm the Claims Court's dismissal of Appellants' complaint.

## IV

We have considered Appellants' remaining arguments and do not find them persuasive. Accordingly, for the reasons stated above, we affirm the judgment of the Court of Federal Claims.

**AFFIRMED**